NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 17, 2015
Decided December 21, 2015

**Before**

JOEL M. FLAUM, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 15-1516

| | |
|---|---|
| KELLIE LEHOUILLIER, <br>     *Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 14-cv-52-bbc |
| CAROLYN W. COLVIN, <br> Acting Commissioner of Social Security, <br>     *Defendant-Appellee*. | Barbara B. Crabb, <br> *Judge*. |

### O R D E R

Two years after fracturing her right femur, Kellie Lehouillier applied for Social Security disability benefits claiming that she no longer could work because of that leg injury and other impairments, including a congenital heart defect. An agency Administrative Law Judge concluded that Lehouillier was still capable of performing unskilled, sedentary work. The agency's Appeals Council upheld that determination, as did a district court when Lehouillier sought judicial review under 42 U.S.C. § 405(g). Lehouillier appeals from the district court's ruling, which we affirm.

Lehouillier was 40 in late 2010 when she applied for benefits. She alleged an onset date of October 3, 2008, the day she had fallen and broken her femur while working at a

Culver's restaurant. Before her onset date, Lehouillier had graduated high school, attended a 2-year college program in child development, and held a variety of jobs over a 20-year period. She is married and has a stepdaughter who was 17 at the time she applied for benefits. After her workplace accident Lehouillier also became the foster parent of an infant. She eventually returned to Culver's part-time—with increasing hours up to 25 per week—but quit just before applying for benefits. The Social Security Administration denied benefits initially in March 2011 and again on reconsideration in July 2011. Lehouillier's hearing before the ALJ was in August 2012.

Lehouillier did not submit any medical records predating her leg injury, but the records she did provide allude to several conditions diagnosed previously. Descriptions of her medical history note that she was born with LEOPARD syndrome (also called "multiple lentigines syndrome"), a rare condition that affects many areas of the body including the heart. At times over the years, this ailment had caused "pulmonary insufficiency" and obstructed electrical impulses from the heart, leading to pulmonary valve surgeries in 1972 (when Lehouillier was 2½) and again in 1997 (at age 27). Medical records from after her accident also note that Lehouillier had self-reported suffering from sleep apnea and asthma.

Doctors had performed emergency surgery after the accident and screwed a metal rod to the fractured femur. A few weeks later Lehouillier attended an Occupational Medicine consultation with Dr. Andrew Floren concerning her claim for worker's compensation. During that first visit Dr. Floren outlined his plan for Lehouillier's eventual return to work. But he wrote in his progress notes that already she had mentioned possibly seeking disability benefits because unnamed doctors at the Mayo Clinic thought she could "get on Social Security Disability" even though her heart was "getting stronger."

Over the next two years, Lehouillier had continued seeing Dr. Floren. Although the fractured femur took longer to heal than Floren expected, by June 2009 he had authorized Lehouillier to work 2 hours per day with restrictions. Later he increased that number to 4 hours, prompting Lehouillier to complain of intolerable pain after a few weeks. When she again brought up the subject of disability benefits, Floren had responded, according to his progress notes, that the topic was "quite premature."

In October 2009, a year after her fall, Lehouillier had seen cardiologist John Rozich complaining of sporadic numbness and tingling in both hands going back 18 months. Dr. Rozich sent her to neurologist Donn Dexter, who was unable to explain

the symptoms and recommended more testing. Another neurologist later attributed Lehouillier's hand numbness to ulnar neuropathy.

That same month, Lehouillier had worn a heart monitor for 48 hours. A few irregular heartbeats were detected, but the cardiologist who conducted the monitoring did not explain their significance or recommend treatment. Nor did Dr. Rozich alter his approach of simply monitoring Lehouillier's condition.

Meanwhile, Dr. Floren had increased Lehouillier's work authorization to 5 hours daily. Lehouillier had requested that increase even while continuing to report "achy pain" in and above her right knee. In his progress notes Floren commented that she was angry because a lawyer had said she had "no recourse" except to work. Floren had responded that, given the nature of her injury and the surgical repair, continued progress toward full-time work "would reasonably be expected."

Then in November 2009, Lehouillier had met again with Dr. Dexter, the neurologist, to discuss the results of an MRI of her brain. The results were "unremarkable" except for "[a]bnormal positioning of the cerebellar tonsils consistent with Chiari one malformation." Dexter suggested consulting another doctor to evaluate the Chiari malformation and related headaches, and he also recommended that Lehouillier use elbow pads for her ulnar neuropathy. That same month Lehouillier also had returned to Dr. Floren complaining of swelling in her right foot and ankle. Floren was "at a loss" to explain these symptoms, and he opined that his "ability to help the patient is somewhat limited at this time."

At the end of 2009, Dr. Rozich had recommended to Lehouillier that she seek evaluation for disability benefits. Yet he wrote in his progress notes that "really she has had no problems." Still, he said, Lehouillier had "the beginning of the potential for the more common or typical coronary artery disease that will potentially form." He noted her complaints of fatigue without explaining the significance of his clinical findings or saying whether his observations corroborated her reported symptoms. Rozich wrote that she was "headed for full or partial disability," that he would "gladly support her candidacy in this," and that she "is simply going to be unable to perform at her current level or the level of normal activity." But he did not recommend any treatment for her heart condition.

The hardware was removed from Lehouillier's leg in February 2010, and in April Dr. Floren had cleared her to resume working with "permanent work restrictions"

including "rare kneeling and no standing or walking more than occasionally." Floren opined that Lehouillier had reached "maximum improvement" and that, for purposes of Wisconsin's worker's compensation statute, her right leg rendered her 10% disabled.

In August 2010, after she quit working, Lehouillier had visited Dr. Rozich. He wrote in his progress notes that they had "talked again about her application for disability" and that he was "firmly supportive of the fact that she is disabled in terms of her ability to work and certainly will answer any questions." But the only medical treatment he recommended concerned a flare-up of seasonal allergies.

A month later, on September 24, 2010, Lehouillier had returned to Dr. Floren, who afterward wrote in his progress notes: "The patient is most insistent that Dr. Rozich does not want her to ever work again and is strongly desiring that somehow I get her on Social Security Disability. I tried to tell her several times that I am unable to do that but she was very insistent that Dr. Rozich had told her 'never to work again,' and since she needs an income she needs to be on Social Security Disability." Floren apparently had reviewed Lehouillier's medical chart during this visit, but his notes seem only to reflect the claimant's subjective belief that she was disabled, "primarily" because of her heart condition, not her leg injury. Indeed, in his progress notes Floren recounted that, at Lehouillier's insistence, he "simply gave her a piece of paper that she should not be working based on her multiple issues but again it is unclear what the specific objective criteria in work restrictions should be (if any) other than" what he already had assessed.

After the initial denial of benefits, a state-agency consultant, Dr. Philip Cohen, had reviewed the medical records and, in July 2011, concluded that Lehouillier should be limited to sedentary work given Dr. Floren's opinions from April and September 2010. Cohen identified LEOPARD syndrome as the primary diagnosis and listed the femur fracture as a secondary diagnosis. His report acknowledges the Chiari malformation and Lehouillier's history of headaches, asthma, and other ailments, but he concluded that Lehouillier was exaggerating her limitations since Dr. Floren "questioned her claims of being disabled by her leg injury."

In January 2012, fifteen months after Lehouillier last had implored Dr. Floren to declare her disabled, she returned with a "Cardiac Questionnaire" from her attorneys and explained that Dr. Rozich, the cardiologist, wanted Floren to discuss with her the disability claim. Floren completed only a few lines of the questionnaire and wrote a "Final Report" offering his opinion that Lehouillier is "totally disabled." This conclusion follows a brief medical history that appears to be a recounting of what Lehouillier had

said during the visit, plus Floren's summary of his physical examination. That exam had disclosed a "tender" right knee but "[r]easonably good motion in all joints, shoulders, hips, knees, and elbows." Floren also noted rhonchi (a rattling sound in the lungs) and a "holosystolic ejection murmur," but he did not characterize these findings as significant. In fact, Floren reportedly had told Lehouillier that he had "nothing further to add to her medical care." Floren asserted that Lehouillier should not "be active more than three hours per day" and only rarely should stand, walk, or lift more than 15 pounds.

Unlike Dr. Floren, Dr. Rozich did not submit a "Cardiac Questionnaire" or any other assessment that LEOPARD syndrome was affecting Lehouillier's capacity to work. Dr. Dexter, the neurologist who had diagnosed the Chiari malformation, did complete a "Multiple Impairment Questionnaire" confirming the existence of that condition and related headaches as well as bilateral ulnar neuropathy. But Dexter did not express an opinion about how, if at all, these conditions impede Lehouillier's ability to work. Rather, he deferred to Dr. Floren "for all functional capacity questions." Dexter did say that Lehouillier's prognosis was "good," that she should "remain stable" with some limitations, and that he was not recommending treatment apart from the medications she already was taking. Those medications, he added, had allowed him to "completely relieve" Lehouillier's pain "without unacceptable side effects." He did say that Lehouillier experiences severe fatigue but did not identify the cause.

At her hearing before the ALJ in August 2012, Lehouillier testified that she could not stand on her right leg for more than 10 to 25 minutes without pain. Her leg pain does not necessarily affect her ability to sit, she said, but the lasting effects of pelvis fractures in 1999 and 2000 sometimes make sitting for more than an hour uncomfortable. After an hour of sitting, she explained, she must walk for about 15 minutes. Lehouillier testified also that several times daily she gets painful heart palpitations lasting 10 to 15 minutes. She added that frequently she grows short of breath when exerting herself, and must sit and concentrate on breathing and slowing her heart rate.

Lehouillier told the ALJ that household tasks would take twice as long without her stepdaughter's help. Typically, she said, she cannot even wash a full sink of dishes before her legs become tired, and frequently her hands go numb for 15 to 30 minutes. She also testified to increasing fatigue, which she attributed to the trauma and stress of her workplace accident coupled with her preexisting heart condition. Lehouillier further described headaches occurring about three times weekly, which she attributed to the Chiari malformation. The headaches do not keep her from completing necessary tasks,

she said, but the pain does slow her down. And generally, she explained, she avoids taking headache medication because it makes her tired.

An internist, Dr. Minh Vu, reviewed Lehouillier's medical records and testified as an expert at the ALJ's request. He opined that the "most relevant impairment" as of the onset date was the femur fracture, which had reached maximum recovery by September 2010. After that, he added, Lehouillier should not have experienced difficulty standing and walking. Dr. Vu also testified about Lehouillier's heart and neurological problems. He said that she has a history of complex congenital heart problems due to LEOPARD syndrome, including pulmonary stenosis (a slowed blood flow caused by a heart malformation). He acknowledged that she will face some limitations as a result of the heart condition but opined that Lehouillier will not require further surgery and is not completely disabled by that impairment. He said that he saw nothing in Dr. Rozich's progress notes suggesting that Lehouillier's heart condition poses a threat to her life, though she might need a pacemaker eventually. Dr. Vu added that the Chiari malformation had the potential of causing many problems but currently is not causing any functional impairment beyond a "firm headache."

Dr. Vu thought that Lehouillier was capable of performing light work, but the ALJ decided that Vu had not given enough weight to Lehouillier's "subjective complaints or the opinions of treating sources" and instead limited her to sedentary work. A vocational expert testified that jobs exist in the national economy that someone of Lehouillier's age, education level, and experience can perform even if limited to sedentary work without concentrated exposure to pollutants. After the ALJ had broadened the work restrictions to make allowance for standing 5 minutes each hour and a 15-minute break every 2 hours, the vocational expert still identified suitable jobs.

The ALJ applied the 5-step analysis for assessing disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), and concluded that Lehouillier was not disabled. At Step 1 the ALJ determined that Lehouillier had not engaged in substantial gainful activity since her alleged onset date. At Step 2 the ALJ identified as severe impairments the residual effects of the femur fracture, "congenital cardiac conditions," "ulnar nerve neuropathy at the elbows," and asthma. At Step 3 the ALJ concluded that Lehouillier did not have an impairment or combination of impairments which satisfies a listing for presumptive disability. Lehouillier does not dispute any part of these conclusions.

At Step 4 the ALJ found that Lehouillier's impairments reasonably could be expected to cause the symptoms she alleged, but he did not fully credit her statements

"concerning the intensity, persistence, and limiting effects" of those symptoms. "The first and primary factor" for that credibility assessment, the ALJ explained, is the medical evidence, but also significant are the "credibility factors as set forth in the regulations." In discussing the medical evidence, the ALJ referred to both Dr. Floren and Dr. Rozich as treating sources but declined to give their conclusions controlling weight. The ALJ explained that he was not endorsing the conclusions in Dr. Floren's "final" report from January 2012, saying:

> First, when Dr. Floren was considering whether the claimant was capable of returning to work, he was working within the context of worker's compensation and considering the claimant's immediate past work, not whether, as required by Social Security, she could perform *any* work. Therefore, when he limited her to three to five hours of activity, he was anticipating that she would be working in the more strenuous job as a fast food worker, where she would be on her feet for at least six hours a day. He made no comment as to whether she could perform less strenuous, sedentary work, as found here. Other considerations include in September 2010, Dr. Floren expressed serious reservations about the claimant's demands for him to find her unable to work. She eventually prevailed upon him to find her unable to perform any work, contrary to his own clinical findings and other objective findings in the record. His eventual opinion appears designed to placate a demanding patient. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. In his own examination, Dr. Floren describes the claimant with normal gait and station, a holosystolic ejection murmur in her heart but regular rate and rhythm, a tender right knee, mild tenderness across the back, reasonably good motion in all joints, and normal reflexes. These are not the level of clinical findings one would expect for a totally disabled individual.

The ALJ did not explain what weight, if any, he gave to Dr. Rozich's progress notes.

The ALJ concluded, at Step 5, that Lehouillier retained the residual functional capacity to perform sedentary work except that she required the option to stand 5 minutes every hour, was limited to frequent but not constant fingering, and should avoid exposure to respiratory pollutants. But even for someone with the identified limitations, the ALJ continued, there are jobs available in the national economy.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner of Social Security. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). We apply the same standard of review as the district court, and will uphold the ALJ's decision if it is supported by substantial evidence. *Pepper v. Colvin*, 712 F.3d 351 361–62 (7th Cir. 2013).

Lehouillier makes only one appellate claim: that the ALJ erred in not giving controlling weight to Dr. Floren's "final report" as the opinion of a treating source. She argues that the reasons given by the ALJ for disregarding that January 2012 report are not "good reasons." We agree with Lehouillier that one of the ALJ's explanations for rejecting Dr. Floren's assessment is incorrect. But the other, principal reason given by the ALJ—that Floren changed his opinion to placate a demanding patient—is adequate to support the ALJ's decision.

Under agency regulations, more weight is presumptively given to opinions from treating sources. *See* 20 C.F.R. § 404.1527. This is so because treating physicians are most familiar with the claimant's conditions and circumstances and thus best able to provide a detailed, longitudinal picture of the claimant's medical issues. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). At the same time, however, a treating physician's statements are sometimes less credible because "many physicians . . . will often bend over backward to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). For this reason, a treating source's opinion is given controlling weight only when it is well-supported and not inconsistent with the other substantial evidence in the record. *See id.; White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). ALJs are required to give "good reasons" for any decision not to award controlling weight to a treating source. *See* 20 C.F.R. § 404.1527(c); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010).[1]

---

[1] Lehouillier argues that we should adopt for this court what he characterizes as the Ninth Circuit's stricter "rule" that an ALJ, before refusing to give controlling weight to a treating-source opinion, must articulate "specific and legitimate reasons that are supported by substantial evidence." *See e.g. Garrison v. Colvin,* 759 F.3d 995, 1012–13 (9th Cir. 2014). The Ninth Circuit's phrasing does not reflect a substantive difference with our own decisions. The Social Security Administration's regulations *already* require that ALJs support their decisions by substantial evidence in the record, and this circuit *already* requires that ALJs address the regulation's checklist of factors in determining how much weight to give the opinion of a treating source.

First, as the Commissioner concedes, the ALJ incorrectly concluded that Dr. Floren's assessment was made in connection with a claim for worker's compensation, not Social Security benefits. Although Dr. Floren's progress notes from many of his consultations with Lehouillier from 2008 to 2010 document that her visits concerned the claim for worker's compensation, the January 2012 "final report" states instead, "This is not a Worker's Compensation injury claim." Dr. Floren's remarks in this report show his understanding that he was providing an opinion concerning Lehouillier's ability to perform any work, not simply whether she could return to her previous employment at Culver's or another restaurant.

Still, the ALJ's principal reason for not giving controlling weight to Dr. Floren's "final report" is supported by substantial evidence. The ALJ explained that Floren's report from January 2012 contradicts his earlier assessments of Lehouillier's condition and was given only to satisfy Lehouillier's repeated demands for an opinion bolstering her claim for Social Security benefits. We have noted that such bias by treating physicians is not uncommon, s*ee Schmidt v. Astrue*, 496 F.3d 833, 842–43 (7th Cir. 2007); *Hofslien*, 439 F.3d at 377, and that internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion so long as the ALJ provides an adequate explanation, *see Skarbek v. Barnhart*, 390 F.3d 500, 503–04 (7th Cir. 2004); *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

Dr. Floren's 2012 finding—made 15 months after his last consultation with Lehouillier and nearly 21 months after he had cleared her to return to work—was sought and given solely to firm up Lehouillier's applications for Social Security benefits and is irreconcilable with Floren's previous assessments of her functional abilities. In his progress notes from his very first meeting with Lehouillier after her leg injury, Floren had written about her interest in getting Social Security benefits and his response that his job was to help her recover from her leg injury so that she could return to work. His later notes indicate that similar discussions were had on at least two more occasions. Indeed, Floren had been aware of Lehouillier's heart condition from the start, and he was also aware that she had been working despite that condition for many years before her fall. Dr. Floren's notes from before January 2012 reflect his unchanging stance that she could eventually go back to her job. His complete turnaround does not purport to rest on additional diagnostic results or updates from other physicians. Rather, his new opinion focuses on Lehouillier's own assessment of causes for her reported symptoms and her emphatic statement that Dr. Rozich did not want her to work.

Lehouillier's effort to explain away Dr. Floren's reversal takes an odd turn in her reply brief. There she says that Floren did *not* have a treating relationship with her in January 2012 because he had not seen her in many months and, thus, had no incentive to color his opinion in favor of disability. This contention, obviously, dooms Lehouillier's argument that the ALJ was required to give Floren's assessment controlling weight under the *treating source* rule.

Lehouillier also argues that Dr. Floren had a more comprehensive view of her medical history available to him when he made his 2012 finding. But in making this argument, Lehouillier points only to the text of the January 2012 report as evidence. As already noted, however, Floren's report does not suggest that he checked with other physicians to see what might have changed since he last was involved with Lehouillier's treatment. Rather, the language of the report implies that Floren rendered his 2012 opinion based on what he already knew as well as Lehouillier's self-report of symptoms she attributed to various ailments. For example, about the Chiari malformation, Floren wrote, "Patient states this gives her burning pain in the neck as well as headaches." He also wrote that LEOPARD syndrome was causing her fatigue and keeping her from walking more than 100 feet, and that a "cracked pelvis" (Lehouillier's words) was causing low back pain. These statements are not indicative of new *medical* evidence; they instead suggest a physician blindly accepting his patient's own diagnoses and opinion that she is disabled.

In any event, Dr. Floren had treated Lehouillier only for her leg injury, and thus his opinion about limitations resulting from her *other* ailments would not have been entitled to weight as the opinion of a treating source. Indeed, it is questionable whether Dr. Floren, an occupational physician, was qualified to render an opinion about the impact of Lehouillier's heart and neurological conditions. One would expect Lehouillier's treating *cardiologist* and *neurologist* to supply that information, but both Dr. Rozich and Dr. Dexter inexplicably deferred to Floren. And, as the Commissioner points out, Lehouillier does not argue that the ALJ also failed to give appropriate weight to the conclusions of these or any other physician. Accordingly, we see no basis for disagreeing with the ALJ's finding that Lehouillier is not disabled.

AFFIRMED.