**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1301**

DAVID RICHARD SIZEMORE,

      Plaintiff - Appellant,

v.

NANCY A. BERRYHILL,

      Defendant - Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Max O. Cogburn, Jr., District Judge. (5:15-cv-00053-MOC)

Argued: September 15, 2017              Decided: October 17, 2017

Before NIEMEYER, KING, and HARRIS, Circuit Judges.

Affirmed by unpublished opinion. Judge Niemeyer wrote the opinion, in which Judge King and Judge Harris joined.

**ARGUED:** Samuel F. Furgiuele, Jr., Boone, North Carolina, for Appellant. Leo Rufino Montenegro, SOCIAL SECURITY ADMINISTRATION, Baltimore, Maryland, for Appellee. **ON BRIEF:** John Stuart Bruce, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

David Sizemore applied for disability benefits from the Social Security Administration in July 2011, claiming that he was disabled due to diabetes and bipolar disorder. After his application was denied by an administrative law judge ("ALJ"), who found that Sizemore was not disabled, and review was denied by the Appeals Council, he commenced this action in the district court. The district court affirmed the ALJ, and Sizemore filed this appeal, contending that the ALJ's analysis was flawed. He argues: (1) that when assessing his residual functioning capacity, the ALJ failed to assess properly Sizemore's mental abilities — particularly his deficiencies in concentration, persistence, and pace — and improperly ignored certain limitations recognized by the State agency psychologist, despite purporting to give that psychologist's report "significant weight"; (2) that the ALJ erred by failing to treat as opinion evidence the "Global Assessments of Functioning" scores given by doctors and other professionals and by "cherry-picking" higher scores, thereby presenting a distorted view of Sizemore's level of functioning; and (3) that "the ALJ misinterpreted evidence, mischaracterized testimony, and 'cherry-picked' facts," particularly in assessing Sizemore's credibility.

After reviewing the record and considering the arguments of counsel on appeal, we affirm. In addition to rejecting Sizemore's arguments claiming deficiencies in the ALJ's opinion, we note that, even though the ALJ found no need to make such a finding, the record indicates, with strong evidence, that Sizemore would have much increased functioning were he to stop abusing alcohol and follow the treatment prescribed for his diabetes.

I

David Sizemore was born in 1977 and attended a couple of years of high school before leaving school. He obtained his commercial driver's license and worked for about 10 years as a truck driver. He stopped working, however, on December 27, 2010, when he was 33 years old because, as he later claimed, he was suffering from worsening diabetes, depression, and anxiety.

Sizemore's medical records from the period when he was still working showed that he was admitted to the hospital for two days in early March 2008 for his third episode of acute pancreatitis. He admitted to binge drinking on the weekends, and a physician diagnosed him with "alcohol induced pancreatitis" and hyperglycemia, noting that "[h]e may be developing diabetes from his pancreatitis." During a psychiatric consultation, Sizemore reported a history of anxiety attacks, depression, and insomnia but denied any current problems with depression or anxiety. Sizemore was readmitted to the hospital later the same month and was diagnosed with new onset diabetes. After his discharge, he received treatment for hyperglycemia and diabetes from Steven Chapman, a family nurse practitioner ("NP") and Sizemore's primary care provider.

On December 27, 2010 — the date Sizemore stopped working and the date he claims to have become disabled — NP Chapman treated Sizemore for lower back pain and a urinary tract infection. Chapman's notes from that visit indicate that Sizemore had been prescribed with insulin and other medications for his diabetes.

A few weeks later, on January 17, 2011, Sizemore was involuntarily hospitalized for alcohol dependence, reporting that he had been drinking a "half gallon [of] Vodka per

day since Christmas" and had been hearing murmuring voices inside his head when he tried to sleep. After Sizemore's discharge a week later, he visited NP Chapman, who noted that Sizemore's "[e]levated blood sugar [was] difficult to control due to likely continued drinking, although he states little to none." Chapman recommended an eye exam based on Sizemore's report of blurred vision, but Sizemore indicated that he could not afford the exam.

In February 2011, Sizemore underwent a mental health assessment during which he reported feeling paranoid, depressed, and anxious "about everything and everybody." He also reported difficulty sleeping and experiencing panic attacks up to two times per week that lasted 15–20 minutes. A licensed professional counselor diagnosed him with alcohol dependence (primary); major depressive disorder (recurrent, moderate); and panic disorder without agoraphobia, indicating that Sizemore's current Global Assessment of Functioning ("GAF") score was 45. When he was evaluated by a psychiatrist later that month, she indicated that Sizemore's GAF score was 55 and similarly diagnosed alcohol dependence in brief remission, panic disorder, attention-deficit hyperactivity disorder, possible bipolar disorder, and nicotine dependence. That doctor recommended that Sizemore begin a mood stabilizer and continue taking Celexa and Haldol, which appeared to be helping his depression and auditory hallucinations.

In May 2011, NP Chapman treated Sizemore for bronchitis, and during those visits Sizemore reported experiencing some numbness in his hands and fingers, as well as blurred vision.

4

In August 2011, soon after Sizemore applied for disability benefits based on his diabetes and bipolar conditions, the Social Security Administration contacted NP Chapman to see if he would be willing to conduct a special examination of Sizemore as relevant to his application for benefits. Chapman declined, however, indicating that it would be better to have a physician perform the examination and that the only issues he had dealt with were Sizemore's "blurred vision, uncontrolled diabetes, and continued alcohol abuse." Chapman added, "[Sizemore] is an active man, and personally, I believe him able to perform meaningful work," noting that his "[c]ompliance and lifestyle are issues."

Sizemore visited the hospital in late September 2011 for vomiting and dizziness related to dehydration and hyperglycemia and again in October 2011 for vomiting caused by diabetic ketoacidosis. NP Chapman examined Sizemore later that month and noted that his diabetes was "uncontrolled." Chapman again recommended that Sizemore visit an ophthalmologist regarding his blurred vision, noting that there was now "no reason" for Sizemore not to go since he was reporting that he had recently obtained Medicaid.

During October 2011, Sizemore's application for benefits was denied on the ground that there was insufficient evidence to evaluate his claim, as a State agency psychologist noted that Sizemore had missed his scheduled appointment for a consultative examination. Sizemore requested reconsideration and, on November 28, 2011, he met with Dr. Rasheda Ahsanuddin, who performed a psychiatric evaluation in connection with Sizemore's application for benefits. During this evaluation, Sizemore reported having episodes of depression that lasted for a few weeks at a time, during

5

which he lost interest in all activities and had difficulty concentrating, as well as episodes of high energy in which he became hyperactive and irritable. He also reported chronic sustained anxiety, frequent panic attacks with agoraphobia, insomnia, and paranoid thoughts. Sizemore denied any use of illicit drugs but admitted having a problem with alcohol. He reported that his mother, with whom he lived, took care of all the household chores, although he acknowledged doing the dishes once in a while and occasionally mowing the lawn. He stated that he "seldom goes shopping," that he "goes to church once in a while," and that he "does not call his friends or relatives on [the] phone much." Dr. Ahsanuddin diagnosed Sizemore with bipolar disorder, generalized anxiety disorder, panic disorder with agoraphobia, and alcohol dependence, rating his current GAF as 50. In Dr. Ahsanuddin's opinion, Sizemore could "understand, retain, and follow simple instructions"; "show sustained attention to perform simple repetitive tasks"; "relate to others including fellow workers and supervisors"; but "[m]ay have difficulty tolerating stress and pressure associated with day-to-day work due to mood swings, mild psychotic symptoms . . . , chronic anxiety, [and] panic attacks with severe agoraphobia."

Shortly after Dr. Ahsanuddin completed his psychiatric evaluation, Sizemore's mother completed a "third-party function report" on December 9, 2011, in which she described how her son's illnesses limited his activities. She indicated that Sizemore "sometimes goes out visiting with friends but not too often"; that he had no problem with personal care, other than needing occasional reminders to take his medicine; that he prepared meals for himself on a weekly basis; and that he did some mowing and yard work once a week and some cleaning inside the house every other day. She also reported

that he left the house on a daily basis and went shopping for personal items or groceries two or three times a month. She indicated that Sizemore did not engage in his hobbies as often as before and also "does not take part or enjoy social events like he did before," estimating that he went to church or other social places "once or twice a month." She also described him as "very moody" and depressed, noting that he had difficulty concentrating, completing tasks, and getting along with others, and that he did not want to be alone for long at a time because of his fear of death.

About a month later, on January 10, 2012, Sizemore was again hospitalized for a week for alcohol detoxification after he "stopped taking his medication, got depressed, [and] started drinking." He was diagnosed with schizoaffective disorder, bipolar type; nicotine and alcohol dependence; and diabetes, and after treatment with medications, therapy, and counseling, his GAF score increased from 35 at admission to 50 at discharge. When he was evaluated by a psychiatrist a few days after his discharge, Sizemore indicated that Celexa "absolutely 'works best'" and that trazodone helped him "sleep very well." The psychiatrist diagnosed him with schizoaffective disorder with concomitant alcohol dependence in early remission, indicating that he may be "depressive type" instead of "bipolar type," and assessed his GAF score as 50 to 55.

Sizemore relapsed and was involuntarily hospitalized from February 20–29, 2012, after drinking heavily, getting into an altercation with his 17-year old son, and damaging his mother's house. He was extremely intoxicated at the time of his admission and indicated that he wanted to kill himself. He also reported that he had been ignoring his diabetic condition. He was diagnosed with alcohol dependence (primary), as well as

7

bipolar I disorder, with severe episodic depression, and given a GAF score of 25. During this period of hospitalization, he acknowledged that he "began drinking alcoholically at 19" and estimated his longest period of sobriety since that time as two months. Treatment records noted that "[h]e has a history of aggression and suicidal threats all of which when intoxicated."

Around this same time, on March 1, 2012, State agency medical professionals reviewed Sizemore's medical records in connection with his request for reconsideration of the agency's denial of benefits and concluded that Sizemore was not disabled. Dr. Monica King, a psychologist, found that he had three severe medically determinable impairments — diabetes, schizophrenia or other psychotic disorder, and a substance addiction disorder — and that his mental health issues imposed moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, but that they were not so severe as to necessarily qualify him for benefits, noting that his records indicated a "pattern of alcoholism and noncompliance [with] meds and [a] pattern of benign [mental status examinations] when [claimant] is not actively intoxicated." She also opined that Sizemore's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the objective medical evidence alone and that Sizemore's statements were only "partially credible," noting in particular that his mother's report indicated that he had a "good ability" to handle activities of daily living; fair concentration, pace, and persistence; normal attention and concentration; and fair social abilities. In assessing his residual functional capacity, one State agency doctor opined that Sizemore's only physical functional limitations were that, because of his

8

poorly controlled diabetes, he should only occasionally climb ladders, ropes, or scaffolds and should avoid concentrated exposures to workplace hazards. In terms of Sizemore's mental ability to perform sustained work activities, Dr. King opined that although Sizemore was moderately limited in his ability to understand, remember, and carry out detailed instructions, he "would be able to understand and remember simple instructions" and "would be able to complete simple tasks . . . and make work decisions." She further noted that Sizemore "may have difficulties maintaining regular attendance," but that, when at work, he "would generally be able to maintain [attention] for at least 2 hrs at a time as needed to do simple, routine tasks." She also concluded that while Sizemore "may have difficulty interacting cooperatively with the general public, with coworkers, and with supervisors," and "may have some difficulty adjusting to basic standards of cleanliness," he "would be able to interact appropriately in a low stress work environment that minimized public contact." Finally, she found that while Sizemore was moderately limited in his ability to respond appropriately to changes in the work setting and "may have some difficulties setting realistic goals," he "would be able to handle routine changes in the work place." She concluded overall that Sizemore was "mentally capable of independently performing basic, routine tasks on a sustained basis" and that his "functioning [was] likely to significantly increase if he remained abstinent from [alcohol] and compliant [with] medication."

When Sizemore had an appointment with NP Chapman in late March 2012, he indicated that he had not been drinking but that "the cravings [were] rough." In mid-April, he admitted using methamphetamine "a few months back" and told a psychiatrist

9

that his last drink was about a month ago, but the psychiatrist noted that he "doubt[ed] this account of events," indicating his belief that Sizemore was continuing "to use alcohol on a daily basis and [was] probably still using methamphetamine" and that his primary diagnosis was "possibly substance-induced mood disorder." When that psychiatrist saw Sizemore again in May 2012, Sizemore reported that he was "doing much better" and that "his mood [had] improved" with changes to his medications, although he "continue[d] to abuse alcohol."

In June 2012, Sizemore was again hospitalized for two days for diabetic ketoacidosis after he was "poorly compliant with his insulin program." His clinical condition "improved rapidly" with an "insulin drip and saline infusion therapy."

A few months later, in October 2012, Sizemore again visited NP Chapman, who refilled one of his diabetes medications and prescribed a new medicine for diabetic neuropathy. Also during that month, Sizemore visited his psychiatrist, reporting increased anxiety and difficulty with sleep but also reporting that he had abstained from alcohol for six months and had been "more compliant with his diabetic medications and control." His psychiatrist started him on two new medications, one of which Sizemore later reported had helped reduce his anxiety.

In November 2012, however, Sizemore spent another three days in the hospital for diabetic ketoacidosis, and doctors increased his insulin dosage.

In January 2013, Sizemore returned to a different hospital's emergency room with hyperglycemia. Later that month, he had a follow up appointment with NP Chapman,

who noted that Sizemore had not "been driving due to blurring of vision due to uncontrolled glucose" but indicated that he was "certainly able to perform other duties."

Sizemore saw his psychiatrist again in February 2013, reporting that his current medicines were helping with his insomnia and anxiety and that "his blood sugar ha[d] been better controlled lately." And when he returned to his psychiatrist's office in early April 2013, he denied any ongoing anxiety or any psychotic symptoms, and his psychiatrist described him as doing "quite well." Later that month, however, Sizemore relapsed with alcohol, reportedly drinking a gallon of vodka over a two-day period, and he was hospitalized for acute diabetic ketoacidosis with hyperkalemia and acute renal failure. He also admitted to using methamphetamines three weeks previously.

After this hospitalization, Sizemore followed up once with NP Chapman, but then, in May 2013, he started seeing Elizabeth Williams, a nurse practitioner, for regular treatment for his diabetes. He reported feeling fatigued and dizzy and experiencing blurring of his vision and stabbing pain in his legs, and she diagnosed uncontrolled diabetes, unspecified type; unspecified hyperlipidemia; and diabetic polyneuropathy.

The next month, Sizemore was evaluated by a licensed clinical social worker associated with NP Williams's clinic and described experiencing panic attacks that last up to an hour, being unable to drive out of fear that he might pass out, and feeling depressed. The social worker diagnosed him with bipolar disorder and agoraphobia with panic disorder. After treating Sizemore for a few months, NP Williams wrote a letter in support of his benefits claim, stating that he was a "brittle diabetic" — meaning that he experienced "extreme swings in blood sugar from very high to very low" — and also

11

suffered from diabetic neuropathy, with pain in his legs due to damaged nerves and impaired sensation in his feet. In her view, these symptoms impaired his ability to concentrate, and a stressful work environment would exacerbate his extreme shifts in blood sugar. She further opined that his diabetes could not be easily managed and his condition was unlikely to improve.

Sizemore appeared for a hearing before an ALJ on August 2, 2013, on his application for disability benefits. At the hearing, he testified that he no longer had a driver's license because his doctors were worried about him unexpectedly blacking out from his diabetes, which he indicated had happened four times in the previous month. He testified that when his mother had to work, she dropped him off at his grandmother's house, so that there would be someone around in case he blacked out, but that he otherwise generally did not leave the house, saying that he did not like to be out in public. He estimated that he went with his mother to the store twice a week but that he would wait in the car because of his fear of crowds and concern about triggering a panic attack. He stated that even with this restriction, he was still having two to three panic attacks a week. He stated that he last consumed alcohol in April when two friends came to his house but indicated that he usually did not spend time with friends. He said that he typically woke up around 6 a.m. and spent most of his time watching television or reading, adding that while he still used a riding lawnmower, he was no longer able to do the "weed-eating part" because physical activity lowered his blood sugar.

At the hearing, the ALJ asked a vocational expert whether there was any work available for a hypothetical individual of Sizemore's age, educational background, and

12

past work experience who had no exertional limitations but who could not use ropes, ladders, and scaffolds; was required to avoid concentrated exposure to vibration and hazards; and was limited to performing simple one, two-step tasks in a low stress work environment with no public contact. The vocational expert indicated that there were unskilled jobs that met those requirements, including dishwasher, general laborer, and general worker in a warehouse setting. The ALJ then asked if any jobs would be available if those same restrictions were in place and the individual needed to have absences from the workstation on a daily basis of varying durations. The vocational expert responded that such a limitation "would eliminate gainful employment in any unskilled settings."

On December 6, 2013, the ALJ issued his decision on Sizemore's application for disability benefits, concluding that Sizemore did not qualify. The ALJ found that Sizemore had not worked since December 27, 2010 and that he had three severe impairments (diabetes, bipolar disorder with panic attacks, and substance abuse), which together significantly limited his ability to do basic work activities but did not satisfy the criteria of an impairment listed in the regulations. In this regard, the ALJ found, relying in particular on the third-party report completed by Sizemore's mother, that Sizemore had no restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace. The ALJ then found that Sizemore had "the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can never climb ropes, ladders, scaffolds[;] [must] avoid concentrated exposure to hazards and

13

vibration[;] and can work only in [a] low stress [setting] defined as non-production jobs [without any] fast-paced work [and] with no public contact."

In formulating this residual functional capacity, the ALJ noted that even though he had found that Sizemore's "medically determinable impairments could reasonably be expected to cause some of [his] alleged symptoms[,] . . . his statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." With respect to Sizemore's diabetes, the ALJ found that the medical record "show[ed] that his elevated blood sugars were the result of a combination of continued alcohol use and noncompliance with his diabetic diet and medication," and that while he had "reported blurred vision and neuropathy, there [was] no medical evidence to support [those] claims." The ALJ similarly found that the medical record did not fully support Sizemore's testimony regarding the limitations imposed by his depression and anxiety; that Sizemore had "made frequent contradictory statements regarding his history, which further weigh[ed] against his credibility"; and that his "credibility [was] further harmed by his failure to follow prescribed treatment." The ALJ also addressed the weight he was giving to opinion evidence, noting that he was assigning "little weight" to NP Williams's opinion because it was "not supported either by her own progress notes nor by the longitudinal medical record" and was instead assigning "significant weight" to the opinions of consulting examiner Dr. Ahsanuddin and the State agency psychological consultant, Dr. King.

Continuing with his analysis and relying on the vocational expert's testimony, the ALJ concluded that while Sizemore was unable to perform his past relevant work as a

14

tractor-trailer driver, there were unskilled jobs existing in significant numbers in the national economy that he could perform based on his age, education, work experience, and residual functional capacity. The ALJ accordingly concluded that Sizemore had not been disabled during the three-year period leading up to his decision.

Sizemore appealed the ALJ's decision to the Appeals Council, which denied his request for review, rendering the ALJ's decision the final decision of the Commissioner. He then commenced this action in the district court, seeking judicial review of the ALJ's decision. On the parties' cross motions for summary judgment, the district court granted the Commissioner's motion, upholding the denial of benefits. From the district court's entry of judgment on February 5, 2016, Sizemore filed this appeal.

II

Sizemore contends first that the ALJ erred in recognizing that Sizemore had "moderate" difficulties with regard to concentration, persistence, and pace but nonetheless in failing, when determining his residual functioning capacity, either to account for this limitation or to explain adequately why it did not affect Sizemore's ability to work, citing for support our decision in *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). He argues further that the ALJ "provided no accommodation for many of the limitations opined by Dr. King," the State agency psychologist who reviewed Sizemore's records at the reconsideration level, "despite the adoption of her opinion."

The record, however, does not support these arguments. The ALJ determined early in his analysis that Sizemore had moderate difficulties with regard to concentration,

15

persistence, or pace, as did Dr. King. Yet, Dr. King also made more detailed findings regarding Sizemore's "sustained concentration and persistence limitations" when assessing his mental residual functional capacity. She explained her view that while Sizemore was moderately limited with respect to his ability (1) to carry out detailed instructions; (2) to perform activities within a schedule, maintain regular attendance, and be punctual; and (3) to complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, he nonetheless "would generally be able to maintain [attention] for at least two [hours] at a time as needed to do simple, routine tasks" and was thus "mentally capable of independently performing basic, routine tasks *on a sustained basis*." (Emphasis added). Dr. Ahsanuddin similarly concluded that Sizemore could "understand, retain, and follow simple instructions" and "show *sustained attention* to perform simple repetitive tasks." (Emphasis added). The opinions of these two doctors thus provided substantial support for the ALJ's finding that, despite Sizemore's overall moderate difficulties with concentration, persistence, or pace, he would nonetheless be able to *stay on task* while performing "simple one, two-step tasks," as long as he was "working in low stress non-production jobs with no public contact." *Cf. Mascio*, 780 F.3d at 638. We accordingly reject Sizemore's argument that a remand is required under *Mascio* or because the ALJ failed to accommodate many of the limitations identified by Dr. King.

Moreover, even were we to accept Sizemore's premise that the ALJ failed to address each of the limitations noted by Dr. King, we would nonetheless conclude that

16

the ALJ's decision is supported by substantial evidence. We note, in this regard, that while the ALJ made no formal findings as to whether drug abuse or alcoholism was "material" because he found that Sizemore was not disabled even with his substance abuse disorder, the ALJ nonetheless identified substantial record evidence indicating that Sizemore's functioning would increase substantially if he stopped drinking and took his medications as prescribed. As just a few examples of the many in the record, Dr. King opined that Sizemore's "functioning [was] likely to significantly increase if he remained abstinent from [drugs and alcohol] and compliant [with his] medication." Similarly, NP Chapman noted that "[c]ompliance and lifestyle are issues" and that his "[e]levated blood sugar [was] difficult to control due to likely continued drinking." From this type of evidence, the ALJ concluded that Sizemore's "elevated blood sugars were the result of a combination of continued alcohol abuse and noncompliance with his diabetic diet and medication."

The law is clear that a claimant who would otherwise qualify as disabled is not entitled to benefits if alcoholism or drug abuse is a contributing factor material to the disability determination. *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). The regulations implementing those provisions specify that "[t]he key factor . . . is whether we would still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1). And with respect to a failure to take medications, another regulation provides that, "[i]n order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." 20 C.F.R. § 416.930(a).

Thus, the ALJ's conclusion that Sizemore was not disabled and was able to work finds further support when Sizemore's alcoholism and noncompliance with prescribed treatment are considered.

## III

Sizemore next contends that the ALJ erred by failing to weigh his various GAF scores as medical opinion evidence and by ignoring his lowest GAF scores. He asserts that "[t]he GAFs which were ignored reflect a different level and greater variability of functioning than that found by the ALJ" and that "[t]he ALJ's treatment of the GAFs of record was inadequate." Again, however, the record does not support Sizemore's argument. To the contrary, it appears that the ALJ considered all GAF scores or the text supporting them.

As the ALJ noted in his opinion, the fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") included a Global Assessment of Functioning scale on which to "consider[] and rate[] [an individual's] psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness," with a higher score indicating an increased level of functioning. The more recent edition of the DSM, however, abandoned the use of GAF scoring, noting "its lack of conceptual clarity" and "questionable psychometrics in routine practice." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013). After the DSM-V was published, the Social Security Administration issued a directive to its ALJs in July 2013, instructing them to still

18

consider GAF scores as medical opinion evidence but emphasizing that GAF scores should not be considered in isolation. The directive stated:

> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.
>
> A GAF score is never dispositive of impairment severity.

*Emrich v. Colvin*, 90 F. Supp. 3d 480, 492 (M.D.N.C. 2015) (quoting Soc. Sec. Admin., Administrative Message 13066 (July 22, 2013)); *see also Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability . . . they may be a useful measurement").

Here, while the ALJ did not expressly recite each of the various GAF scores given to Sizemore, the ALJ's decision demonstrates a careful consideration of the entire record, including the reasons supporting the GAF scores that were given. Moreover, the ALJ explicitly reported most of the scores given by doctors, as distinguished from those given by counselors and other professionals. But most importantly, the GAF scores by themselves do not, in this case, negate the other record evidence supporting the ALJ's determination that Sizemore was not entitled to benefits, especially given that Sizemore's lowest GAF scores were assessed when he was being hospitalized for alcohol detoxification and therefore were not especially meaningful.

19

In short, the record does not support Sizemore's argument that the ALJ did not consider his various GAF scores or give them appropriate weight. Not only did he consider GAF scores, explicitly reporting a few of them, he considered all of the text that supported the various GAF scores that Sizemore was given.

IV

Finally, Sizemore contends that the "ALJ misinterpreted evidence, mischaracterized testimony, and 'cherry-picked' facts to make many key findings," identifying several examples that were part of the ALJ's assessment of Sizemore's credibility. We conclude, however, that any minor flaws that Sizemore may have identified — and they are minor indeed — do not undermine the ALJ's overall assessment of the reliability of Sizemore's description of the severity of his symptoms.

First, Sizemore argues that the ALJ erred in his reliance on the entries in the "social history" portion of the records maintained by NP Chapman, asserting that "[e]xamination of Mr. Chapman's 'social history' template shows that it was rarely adjusted" and that, "[e]xcept on the rare occasion when an entry was changed, there is no indication that these entries were reviewed on each visit." It appears that Chapman may not have updated the social history portion of Sizemore's records on each of his many visits with Sizemore. But in any event, the social history portion of NP Chapman's records played an exceedingly minor role in the ALJ's exhaustive explanation of why he was concluding that Sizemore was "not entirely credible."

Sizemore next argues that the ALJ's use of his mother's report regarding his activities was flawed, contending that the ALJ erroneously "assumed there had been no change in [his] functioning over the approximately twenty months between the December 9, 2011 questionnaire and [the] August 2, 2013 hearing" and that, in any event, "Ms. Sizemore's responses hardly showed a capacity for substantial, gainful employment." The ALJ, however, was entitled to rely on the questionnaire submitted by Sizemore's mother, which was completed a year after Sizemore claimed to be disabled. At that point, according to his mother, Sizemore had no problem with personal care, prepared meals for himself on a weekly basis, regularly performed household chores, went outside on a daily basis, and went shopping two to three times per month. Moreover, in assessing Sizemore's credibility, the ALJ was entitled to rely on the fact that, within weeks of his mother's report, Sizemore described himself to Dr. Ahsanuddin as being more limited in his daily activities, telling Dr. Ahsanuddin that he did not help with cooking, laundry, or vacuuming and that he seldom went shopping.

Sizemore also argues that the ALJ mischaracterized his testimony regarding his daily activities, emphasizing that the ALJ asked him broadly at the hearing whether he had done a series of activities "[s]ince December 2010 to the present time" but then relied on his answers to conclude that Sizemore had "admitted that he can . . . cook, wash dishes, do laundry, take out trash, and clean the living room." This conflation of time, however, played a very small role in the ALJ's overall analysis. Similarly, any minor error that the ALJ may have made in identifying conflicting statements by Sizemore became virtually meaningless in light of the ALJ's well supported finding that "many of

21

his physicians and health care providers [had] openly questioned [Sizemore's] credibility."

Finally, Sizemore argues that the ALJ erred in evaluating whether he had failed to follow prescribed treatments. Yet, Sizemore himself acknowledges that the ALJ "gave three examples of this," and he only argues that "one of these was incorrect." Thus, ample evidence remained to support the ALJ's finding that Sizemore's credibility was "harmed by his failure to follow prescribed treatments."

\* \* \*

At bottom, we conclude that the ALJ applied the correct legal standards and that his decision is amply supported by substantial evidence. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Accordingly, we affirm the district court's judgment, which affirmed the ALJ's decision.

AFFIRMED